Rafael **RAMOS** et. al., Plaintiffs,

v.

**DAVIS & GECK, INC.,** Defendant.

No. 94–2737 HL.

United States District Court, D. Puerto Rico.

June 20, 1997.

Herbert W. Brown, III, Brown & Ubarri, San Juan, PR, for Plaintiffs.

Pedro Pumarada–Surillo, Pedro J. Manzano–Yates, Fiddler, Gonzales & Rodriguez, San Juan, PR, for Davis & Geck, Inc., American Home Prod., Francisco Rosaly.

Pedro J. Manzano–Yates, Fiddler, Gonzales & Rodriguez, San Juan, PR, for Cyanamid of Puerto Rico, Inc.

## OPINION AND ORDER

LAFFITTE, District Judge.

On December 28, 1994, Plaintiff Rafael Ramos, his wife, and their two children filed

suit alleging that Ramos' former employer Davis & Geck, Inc. constructively discharged him because of his age. On November 18, 1974, Ramos began working for Davis & Geck, Inc. as an accountant in the Accounting Division. In 1980, his supervisors promoted him to Budget Supervisor of the Cost Accounting Section. Ramos alleged that he was pressured into leaving on April 21, 1992 as a result of his demotion (in title only) to the Budget and Cost Accountant position, his transfer to a smaller working cubicle, the heated debates he had with his new supervisor, and the unreasonable pressures that the new supervisor imposed upon him. According to Ramos, these unjustified changes arose out of an age-discriminatory animus.

After a five-day jury trial which began on January 28, 1997, the jury returned its verdict and found by a preponderance of the evidence that: (1) Defendant constructively discharged Ramos; (2) Defendant did not constructively discharge Ramos because of his age in violation of ADEA; (3) Defendant constructively discharged Ramos without just cause because of his age in violation of Puerto Rico's Law 100, P.R. Laws Ann. tit. 29, § 146 *et. seq.* (1995), and awarded Ramos $150,000.00 doubled under the law to $300,-000.00; (4) Ramos' wife, Elsa González, suffered damages as a result of Defendant's discriminatory conduct and awarded her $50,000.00 under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141 (1990); and (5) Ramos' sons, Carlos Ramos and Javier Ramos, did not suffer damages as a result of Defendant's discriminatory conduct under Article 1802. Dkt. No. 75. Shortly thereafter, on February 13, 1997, the Court entered judgment accordingly. Dkt. No. 78.

*Post–Judgment Motions:*

Before the Court are several post-judgment motions including (1) Plaintiffs' motion

for front pay, attorney's fees, and pre-judgment interest under Puerto Rico's Law 100 and Defendant's opposition thereto, Dkt. Nos. 79, 81, 86, & 92; (2) Defendant's motion for a judgment notwithstanding the verdict, Defendant's motion for a new trial, and Plaintiffs' opposition thereto, Dkt. Nos. 82 & 88; (3) Plaintiffs' motion for costs and Defendant's opposition thereto, Dkt. Nos. 80, 87, 89, & 91; and (4) Plaintiffs' motion for the execution of the judgment and Defendant's submission of a supersedeas bond, Dkt. Nos. 85 & 90.

These motions require the Court to consider two issues of first impression: (1) the parameters for recovering front pay under Puerto Rico's Law 100; and (2) the methodology applicable to an award of attorney's fees under Puerto Rico's Law 100. The Court shall consider each motion seriatim.[1]

*A. Front Pay, Attorney's Fees, and Pre–Judgment Interest:*

Pursuant to Federal Rule of Civil Procedure 59(e), Plaintiffs timely move to amend the judgment to include front pay, attorney's fees,[2] and pre-judgment interest. Because the jury did not find that there was an ADEA violation, Plaintiffs properly make this motion pursuant to Puerto Rico's Law 100 and Puerto Rico Rule of Civil Procedure 44.3(b). *See* P.R. Laws Ann. tit. 29, § 146 *et. seq.* (1985).

*i. Front Pay:*

Plaintiffs argue that the Court should amend the judgment and award Rafael Ramos at least $240,000.00 and as much as $987,718.00 in front pay. Plaintiffs suggest that the jury's ADEA and Law 100 verdicts are inconsistent and require the Court to harmonize the results. Plaintiffs' explanation for this seeming contradiction is quite unique: Plaintiffs state:

> 10 days of the entry of judgment and, therefore, were timely. Fed.R.Civ.P. 50(b); Fed.R.Civ.P. 54(d)(2)(B); Fed.R.Civ.P. 59(b).

**1.** The Court issued the judgment in the case on February 13, 1997. Six days later, on February 19, 1997, the Clerk of the Court entered the judgment on the docket and notified the parties accordingly. Dkt. No. 78. Plaintiffs' request for costs, front pay, attorney's fees, and pre-judgment interest, and Defendant's request for judgment n.o.v. and for a new trial were filed within

**2.** Plaintiffs' request for attorney's fees is pursuant to Federal Rule of Civil Procedure 54(d)(2)(A).

A fair reading of the jury's verdict can only lead to the inescapable conclusion that since under Law 100 the jurors were afforded the opportunity of awarding back pay, damages for mental and moral anguish and liquidated damages they chose to proceed under Law 100, instead of under the ADEA. Had the jury awarded back pay and liquidated damages under both statutes the verdict would have been duplicitous and improper. Hence, it is evident that under a fair and reasonable reading of the verdict, Ramos prevailed in both his state and federal claims.

Pls.' Mot. Amend J., Dkt. No. 81 at ¶ 5. From the jury's verdict, Plaintiffs draw the interesting, nonetheless misguided, conclusion that co-Plaintiff Rafael Ramos prevailed under both ADEA and Law 100. Plaintiffs, for sure, do not have to rely on ADEA to argue for reinstatement and, in the alternative, for front pay. *See Odriozola v. Superior Cosmetic Distributors Corp.*, 116 D.P.R. 485, 16 Official English Translations 595, 623–24 (1985) (when reinstatement can not be ordered then front pay becomes an indispensable part of the just compensation of an employee under Law 100).

 Regardless of Plaintiffs' motive for attempting to draw such a conclusion, Plaintiffs' explanation for the jury's verdict misses the mark. The jury's verdict is entirely consistent with the applicable law under ADEA and Law 100. In fact, it indicates that the jury had a keen awareness of the subtle differences between ADEA and Law 100. As the Court explained to the jury, the burden of proof under the federal statute and Puerto Rico statute is entirely different. One could argue that it is, in fact, potentially outcome-determinative. While the ultimate burden of proof rests upon the plaintiff in an ADEA case, the ultimate burden of proof in a

Law 100 case rests upon the defendant. *Wildman v. Lerner*, 771 F.2d 605, 609 (1st Cir.1985); *Dominguez v. Eli Lilly and Company*, 958 F.Supp. 721, 741–43 (D.P.R.1997); *Rosa v. Burns & Roe Services Corp.*, 726 F.Supp. 350, 353 (D.P.R.1989). Therefore, as the Puerto Rico Supreme Court so aptly concluded, "the local legislation is more favorable to plaintiff than its federal counterpart .... it is possibly conceivable that in some controversies the result may ultimately rest on which of the two statutes applies." *Ibañez Benitez v. Molinos De Puerto Rico*, 114 D.P.R. 42, 14 Official English Translations 58, 73 (1983). Undoubtedly, as a result of the heavier burden of proof, the jury found against Rafael Ramos under ADEA and for Rafael Ramos under Law 100. The jury's verdict is consistent and does not require harmonization.

 Plaintiffs rely on *Odriozola* and *Selgas v. American Airlines, Inc.*, 104 F.3d 9 (1st Cir.1997) to recover Rafael Ramos' projected future earnings with Davis & Geck, Inc. until Ramos reaches the age of seventy. There are three reasons, however, why the Court denies Ramos' motion. First, Ramos did not make a specific request for front pay under Law 100 in the pretrial order. Therefore, Ramos waived his right to request this equitable remedy. Second, in the alternative, the Court finds that Ramos has not demonstrated that reinstatement, which he does not request and does not want, is an impossibility because of an existing antagonism between him and Davis & Geck, Inc. Third, even assuming that Ramos demonstrated that reinstatement was impossible because of an existing antagonism, the Court would find that the jury's verdict made him whole again and, therefore, deny his request for front pay.[3]

---

**3.** In the alternative, there is a fourth and final reason why the Court denies Rafael Ramos front pay. Under Law 100, the Court finds that an employee must seek reinstatement before he or she can request front pay. Because Ramos never requested reinstatement, he is not entitled to front pay. *See Wehr v. Burroughs Corp.*, 619 F.2d 276, 283–84 (3d Cir.1980) ("Wehr's argument that he is entitled to future damages in lieu of reinstatement presupposes that he wanted to be reinstated."); *Greene v. Union Mutual Life Insurance Company*, 635 F.Supp. 1437, 1438 (D.Me.

1986) ("This Court is fully persuaded that 'front pay' damages, being allowable only as an alternative for reinstatement of the Plaintiff where that is impracticable or impossible, such damages cannot be awarded where *no claim is made in the litigation* for such reinstatement.") (emphasis added); *but see Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 730 (8th Cir.) (holding that the failure to request reinstatement is not an absolute bar to the district court's consideration of awarding front pay in lieu of reinstatement),

■ The first reason is very straightforward. The pretrial order "shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." Fed.R.Civ.P. 16(e). "If pretrial orders are to achieve their intended purpose, 'courts and litigants must ordinarily take them seriously.'" *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1195 (1st Cir.1995) (quoting authority omitted), *cert. denied*, — U.S. —, 116 S.Ct. 1423, 134 L.Ed.2d 547 (1996). The failure to state the damages that the plaintiff is specifically seeking in the pretrial order waives that claim for relief. *See, e.g., Reich v. Tiller Helicopter Services, Inc.*, 8 F.3d 1018, 1035 n. 12 (5th Cir.1993) (by omitting a claim for back pay from the complaint the Secretary waived the right to seek that relief).

Ramos admits that he has never requested reinstatement. At the time the complaint was filed and throughout the course of the litigation, Ramos maintained that reinstatement was impossible or impractical. *See* Pretrial Order, Dkt. No. 38 at 10. A close analysis of the pretrial order also demonstrates that Ramos only sought front pay in relation to his ADEA claim and never requested front pay for his Law 100 claim. *Id.* at 10–11. Ramos specifically asked for back pay, liquidated damages, and front pay under ADEA. *Id.* at 10. For Law 100, Ramos merely stated:

> Under Law 100, Ramos is entitled to recover for his mental and moral anguish as a result of his discriminatory dismissal. All damages recovered by Ramos under Law 100, including those for mental and moral anguish, must be doubled pursuant to said statute without any special showing.

*Id.* at 11. Quite clearly, Ramos never requested front pay under Law 100 in the pretrial order and, as a result, waived his right to seek such relief. Ramos' specific

requests for relief under ADEA and his requests for pre-judgment interest and attorneys' fees under Law 100 belies any claim that he was unaware of the obligation to define the specific relief that he seeks for each claim in the pretrial order. *Id.* at 11. The Court must, therefore, deny Ramos' claim for front pay.

■ Even if Ramos included the claim of front pay under Law 100 in the pretrial order, the Court would reach the same result. Under Law 100, as under ADEA, Ramos is not entitled to front pay because Ramos has not claimed (much less demonstrated) that reinstatement, which he does not desire, is impossible because of an existing antagonism between himself and his employer or impractical for some other significant reason.

Before *Odriozola*, it was unclear whether an employee could recover front pay under Law 100. *See Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616–17 (1st Cir.1985) (holding that the Puerto Rico Anti–Discrimination Statute is self-contained and does not authorize damages for future earnings). The Supreme Court in *Odriozola*, however, cleared up any existing confusion. It followed the majority rule in the federal courts of appeals and, in particular, the Second Circuit's decision in *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724 (2d Cir.1984) and held that the wrongfully dismissed employee under Law 100 has the right to reinstatement and, in the alternative, the right to front pay. 16 Official English Translations at 623–24.

■ Under Law 100, however, reinstatement is the favored remedy. Before an employee can seek front pay, the employee must demonstrate that his or her reinstatement is not possible because of an existing antagonism between him or herself and the employer or reinstatement is impractical for other reasons.[4] This requirement is clear from *Odriozola*:

---

cert. denied, 506 U.S. 1014, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *EEOC v. Prudential Federal Savings & Loan Ass'n*, 763 F.2d 1166, 1173 n. 2 (10th Cir.) (same), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).

4. Although *Odriozola* only discusses the antagonism between a discharged employee and his or her employer as a reason to deny reinstatement, *Odriozola's* reference to *Whittlesey* and general discussion of recoverable damages indicates that there may be other reasons why reinstatement is

We conclude, just as the Second Circuit did, that neither ADEA nor our Act No. 100 limits the concept of damages *when reinstatement of the employee cannot be ordered either because, as in Whittlesey. the antagonism between the employer and employee prevents it,* or, because as in the instant case, the employee is beyond 65 years of age, which is the maximum age covered by our Act.

16 Official English Translations at 624 (emphasis added). The only other Supreme Court decision to discuss future earnings in the context of Law 100, the Court's subsequent decision in *López Vicil v. ITT Intermedia, Inc.,* 97 J.T.S. 42 at 833 (1997), also emphasized the law's preference for reinstatement over front pay. It held that the trial court must first determine whether reinstatement, the preferred equitable remedy, is a possibility before reaching the question of front pay. *Id.* at 838. Assuming *arguendo* that an employee may only seek front pay, the employee clearly has the burden of demonstrating that reinstatement is not possible or impractical.[5] Then and only then may the employee show that front pay is a reasonable and appropriate equitable remedy under the circumstances of his or her particular case.

Furthermore, from the cases cited by the Court in *López Vicil,* it is clear that the award of front pay is not automatic but contingent upon the discretion of the trial court. *See Selgas,* 104 F.3d at 14 n. 6 (trial courts have the ability to fashion front pay awards to avoid granting speculative windfalls to employees); *Thomlison v. City of Omaha,* 63 F.3d 786, 790 (8th Cir.1995) (front pay is optional remedy at the court's discretion); *Wells v. New Cherokee Corp.,* 58 F.3d 233, 238 (6th Cir.1995) ("A plaintiff who is not entitled to reinstatement is not automatically entitled to an award of front pay."); *Roush v. KFC National Management Company,* 10 F.3d 392, 400 (6th Cir.1993) (denying employee an award of front pay because the employee chose not to seek alternative employment and to accept social security benefits), *cert. denied,* 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994); *In re Lewis,* 845 F.2d 624, 630 (6th Cir.1988) (reinstatement should be granted unless there are exceptional circumstances).

■ On the one hand, Ramos argues that reinstatement is not possible because he is incapacitated due to his emotional condition. Ramos asserts that his expert witness supports his claim of incapacitation and that is the reason why the Social Security Administration declared him disabled. On the other hand, Davis & Geck disputes Ramos' assertion. It argues that its expert witness testified that Ramos was able to work and that the Puerto Rico State Insurance Fund only declared Ramos to be 5% disabled. From Ramos' arguments and evidence, the Court can not find that Ramos' reinstatement is an impossibility or impracticality under Law 100.[6] Based on independent review of the Record, including the testimony of Plaintiffs'

impractical or impossible such as the mental condition of the employee created by the employer's unlawful actions. The *Odriozola* Court, for example, rejected the employer's contention that the trial court should have excluded the period of time when the employee was absent from work due to his mental condition in the award of back pay. The Court found that the employee "could not work because he was ill, and said illness was due to [the employer's] discriminatory action against him. Three-fourths of a century ago we clearly held that the probable consequences of the damage done constitute an integral part of the damages claimed." 16 Official English Translations at 619. It follows, therefore, that an employee may demonstrate that reinstatement is impractical because of his or her mental condition which was created by the employer's discriminatory actions.

5. An employee seeking solely front pay appears to be in a unique position (at least as far as the published opinions in this area are concerned). *See supra* at n. 3. More often, the employee seeks reinstatement (and possibly front pay for the period of time before he or she is reinstated) and the employer has the burden of demonstrating that reinstatement is impossible or impractical. The burden is on the employer because reinstatement is the preferred equitable remedy. Given the opposite situation, as in this case, it becomes readily apparent that it is the employee's burden to show that reinstatement is impossible or impractical.

6. *Selgas,* cited with approval by the Supreme Court of Puerto Rico in *López Vicil,* requires the district court to hold, at the very least, a limited evidentiary hearing to determine whether reinstatement is appropriate. The parties' post-judgment memorandums on reinstatement satisfies *Selgas'* requirement.

expert and Defendant's expert at trial, Ramos has not demonstrated to the Court's satisfaction that he can no longer return to work. This conclusion is supported in part by Ramos' statement on cross-examination that his own physician Dr. Sanchez Raffuci told him that he could return to work. Rather than listen to his doctor's advice, Ramos testified that he made an attempt to return to work one day but simply could not take the step of beginning his job again. From an analysis of the entire Record, especially Ramos' testimony, the Court finds that Ramos is capable of returning to his former position but the stresses related to the job and his personal life, not the Defendant's prior discriminatory conduct, pose the greatest obstacle for him.

 Assuming *arguendo* that Ramos was able to demonstrate that he should not be reinstated at Davis & Geck, Inc., the Court would once again deny Ramos front pay. As the Court explained earlier, front pay is not an automatic guarantee under Law 100. In fact, based on the cases cited in *López Vicil*, it is more than clear that front pay can be denied at the discretion of the district court. Based on an evaluation of the Record in this case, the jury's $150,000.00 verdict doubled to $300,000.00 in favor of Ramos, and the equities of the case, the Court finds that an additional award of front pay is inappropriate. The jury verdict has made Rafael Ramos whole again.

Because of the four reasons expressed above, (1) Plaintiffs' failure to request front pay in the pretrial order, (2) Plaintiffs' failure to demonstrate that reinstatement is impractical or impossible, (3) the Court's determination that the jury's verdict made Rafael Ramos whole again, and (4) Plaintiffs' failure to request reinstatement in their complaint or the pretrial order, the Court hereby **denies** Plaintiffs' motion to amend the judgment to include front pay.

### ii. Attorney's Fees:

 Plaintiffs are requesting $224,315.00 in attorney's fees. Defendant does not dis-

pute that Plaintiffs are entitled to attorney's fees under Law 100.[7] Law 100 states categorically that "[i]n any judgment passed against any employer or labor union the latter shall be imposed costs and a reasonable sum which shall never be under one hundred (100) dollars for attorney's fees." P.R. Laws Ann. tit. 29, § 149 (1985). Defendant, however, objects to the amount of attorney's fees requested and, more specifically, to the hours that Plaintiffs' attorneys have claimed to work on the Law 100 and Article 1802 claims.

The Puerto Rico Supreme Court has not provided the local courts in Puerto Rico with any guidance on how to apply the reasonable attorney's fee provision in Law 100 cases. Neither party, in fact, has cited a Puerto Rico case in support or in opposition of the attorney's fee request. This is entirely understandable because there is no Puerto Rico Supreme Court case explaining the proper methodology for recovering reasonable attorney's fees pursuant to Law 100. *See, e.g., López Vicil v. ITT Intermedia, Inc.,* 97 J.T.S. 42 at 833, 839 (1997) (increasing attorney's fee award from $15,000.00 to $20,000.00 pursuant to Law 100 without explaining the methodology used to arrive at the amount awarded).

The Puerto Rico Supreme Court has expounded on the methodology that the trial courts should use when awarding attorney's fees because of the non-prevailing party's obstinacy. Unfortunately, that methodology is inapplicable to the recovery of attorney's fees under Law 100. *See* P.R. Laws Ann. tit. 32, App. III, Rule 44.1(d) (1996 Supp.); *Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.,* 20 F.3d 15, 24 (1st Cir.1994) (explaining the recovery of attorney's fees pursuant to Puerto Rico Rule of Civil Procedure 44.1(d)).

In *Corpak Inc. y Art. Printing, Inc. v. Ramallo Brothers Printing, Inc.,* 125 D.P.R. 724, 734–39 (1990), the Puerto Rico Supreme Court rejected the application of the "Lodestar" method, the "12 Factors" method, and the *Hensley* hybrid approach for analyzing

---

7. Plaintiffs, once again, argue that Ramos "was successful in both his ADEA and Law 100 claims." Pls.' Mot. Amend J., Dkt. No. 81 at ¶ 16. As explained previously, Plaintiffs misread

the jury's verdict. Regardless of their myopic view, Plaintiffs are entitled to their reasonable attorney's fees pursuant to Law 100.

fee requests under the obstinacy standard. *See Hensley v. Eckerhart,* 461 U.S. 424, 432–37, 103 S.Ct. 1933, 1939–41, 76 L.Ed.2d 40 (1983) (explaining and adopting the hybrid method); *Lindy Bros. Bldrs., Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973) (explaining the Lodestar method); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) (explaining the "12 Factors" method). Despite the widespread usage of these methods for determining fee awards in federal civil rights litigation, *see* 42 U.S.C.A. § 1988 (1994), the Puerto Rico Supreme Court found that section 1988's compensatory purpose was incompatible with Rule 44.1(d)'s goal of penalizing the stubborn, non-prevailing litigant. In cases where the trial court decided to punish the litigant for its conduct, the Court opted for a more flexible and discretionary approach. Under this method, trial courts must consider (1) the litigation process, (2) the legal questions involved, (3) the amount of fees requested, (4) the time that the prevailing party's attorneys invested in the case, (5) the preclusion of other employment by the attorneys as a consequence of taking the case, and (6) the reputation and ability of the prevailing party's attorneys. *Id.* at 728. As the Court explained in *Corpak,* this method is inappropriate for fee-shifting statutes such as Law 100. As a result, it remains an open question whether the Puerto Rico Supreme Court will apply the "Lodestar" method, the "12 Factors" method, the *Hensley* hybrid approach, or some other unknown method for the recovery of reasonable attorney's fees in Law 100 cases. *Corpak,* 125 D.P.R. at 739 n. 15.

Whether the Supreme Court of Puerto Rico will adapt the *Hensley* model or a more nonobligatory mechanism is an issue of first impression and not reasonably clear from the Court's precedents. On the one hand, it is arguable that the Court will adopt the *Hensley* methodology. The Court has gleaned the federal statutory counterparts to fill in the missing gaps of Law 100. *See, e.g., Odriozola,* 16 Official English Translations at 610, 618, 620, 623 (adopting ADEA's test to determine whether the parent corporation is liable for the alleged discriminatory conduct under Law 100, adopting ADEA's rule that uncol-

lected fringe benefits are compensable as lost earnings for Law 100, adopting the federal tests to determine whether the employee had mitigated his or her damages under Law 100, and adopting the Second Circuit's rule that a dismissed employee may have the right to compensation for front pay under Law 100). Furthermore, in *Corpak,* the Court found that the attorney fee-shifting language in the federal statutes was analogous to the recovery of reasonable attorney's fees in Puerto Rico statutes. 125 D.P.R. 736 n. 13. Given that Law 100 is a labor statute and the federal Fair Labor Standards Act of 1938, with similar fee-shifting language, uses the *Hensley* methodology to determine the award of reasonable attorney's fees, it would be logical for the Puerto Rico Supreme Court to adopt the *Hensley* model to Law 100. *See* Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b) (1997 Supp.) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); *Diver v. Goddard Memorial Hospital,* 783 F.2d 6, 8 (1st Cir.1986) (applying *Hensley* to a Fair Labor Standards Act claim).

Yet, on the other hand, the *Corpak* Court found it troubling that the *Hensley* approach was so detailed and specific that it created a second round of major litigation. 125 D.P.R. at 732–34. As a result, the *Corpak* Court emphasized the need to give the trial courts extensive discretion to determine the award of fees. The Court cited the First Circuit Court of Appeals' decision in *Aubin v. Fudala,* 821 F.2d 45, 47 (1st Cir.1987) with approval because the First Circuit emphasized the importance of delegating a great deal of discretion to the trial court's award of attorney's fees and criticized the need for the district court to provide a detailed explanation for every minor decision curtailing the fee request.

After a close look at the *Corpak* decision, the Court hereby finds that, until the Puerto Rico Supreme Court rules otherwise, the *Hensley* method shall apply to requests for attorney's fees under Law 100. As this Court explained above, there are good reasons why the Supreme Court may not adopt

this model. If anything, however, the Puerto Rico Supreme Court would reject the *Hensley* methodology in favor of a system that granted the trial court more discretion to award attorney's fees and would not require as detailed an explanation for the court's award as the *Hensley* paragon. Consequently, adopting the *Hensley* approach errs on the side of caution in favor of a system which would be subject to greater review and second-guessing than the methodology that the Puerto Rico Supreme Court will likely endorse in the future.[8]

The Court's decision to adopt *Hensley*'s model to requests for attorney's fees under Law 100 is reinforced by the parties' implicit acceptance of that approach. Although Plaintiffs mistakenly argue that they were successful under ADEA, their arguments for attorney's fees and their use of the Lodestar method to calculate the total amount of fees owed is indicative of their acceptance of *Hensley*'s application to Law 100. Pls.' Mot. to Amend, Dkt. No. 81 at 8–9. Similarly, Defendant's arguments in favor of reducing the award requested, such as the lack of contemporaneous time records and the excessive claims for fees, reflect an acceptance of the *Hensley* model.

■■■■ Having thoroughly explained the reasons for applying the *Hensley* paragon to Law 100's fee-shifting statutory command, it is now time to discuss the parameters of *Hensley*. The starting point for the award of attorney's fees is the Lodestar. The Court scrutinizes the prevailing party's claims for attorney's fees and determines the number of hours that the attorney(s) reasonably expended on the litigation of prevailing claims. This number is then multiplied by a reasonably hourly fee. Of course, "[t]he party seeking an award of fees should submit evidence supporting the hours worked and rates claimed . . . [and][w]here the documentation

of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. Awards may be reduced because of (1) the overstaffing of a case, (2) the excessiveness of the hours expended on the legal research or the discovery proceedings, (3) the redundancy of the work exercised, or (4) the time spent on needless or unessential matters. *Id.* at 432–35, 103 S.Ct. at 1939–40.

■■■■ The Lodestar amount can be adjusted upward or downward based on whether the prevailing party was unsuccessful on all of his or her claims and the level of success that was achieved. *Id.* at 434–35, 103 S.Ct. at 1940. The 12 Factors described in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974) not only influence the amount of time that the prevailing party's attorney(s) reasonably expended on the case but also the decision to increase or decrease the monetary award. *Id.* at 434 n. 9, 103 S.Ct. at 1940 n. 9. These factors are: (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; and (12) Awards in similar cases. *Johnson*, 488 F.2d at 717. Notably, "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley*, 461 U.S. at 436–37, 103 S.Ct. at 1941.

---

**8.** In other words, under the *Hensley* approach, this Court's determination of the award for attorney's fees will more likely be the subject of a second round of major litigation. The *Hensley* approach requires the Court to carefully examine Plaintiffs' fee request and provide a meticulous explanation for the award. Most importantly, when the requested attorney's fees are not granted, the Court must provide a substantive explanation for the partial or complete denial.

Because the Supreme Court of Puerto Rico is understandably averse to such a second wave of litigation, should it adopt a different approach, the trial court shall have more discretion in its award of attorney's fees and the trial court will not have to provide a detailed explanation for its decision. Under that system, only under rare circumstances shall the district court's award be overturned as an abuse of its discretion.

Plaintiffs are seeking $224,315.00 in attorney's fees for the work of their two lawyers. Plaintiffs base their fee request, in part, on a $150.00—$175.00 hourly rate. Defendant does not object to this rate. Based on the Court's knowledge of civil litigation and the average hourly rate billed by the attorneys that specialize in this field in the District of Puerto Rico, the Court finds that this rate is reasonable. However, there are several obstacles which hinder Plaintiffs from receiving the bulk of their fee request.

The principal hurdle to Plaintiffs' request is that their attorneys have not filed contemporaneous time records. On February 28, 1997, Plaintiffs printed out the time that their attorneys spent on this case dating back to December 1992, two years before the complaint was filed in this Court. If this was a section 1988 fee request, the Court would deny Plaintiffs' fee request completely because they have violated the rule in *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984). "[T]he absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Id.* at 950; *see also Deary v. City of Gloucester*, 9 F.3d 191, 197–98 (1st Cir.1993) (affirming the deduction of those hours where the records were not sufficiently precise or supported by contemporaneous evidence). While the Court shall not adopt the *Grendel's Den* rule strictly to Plaintiffs' Law 100 attorney's fee request, the Court will be extremely vigilant in analyzing Plaintiffs' claims because the rule requiring contemporaneous time records is both sound and fair. Where there is a doubt as to the reasonableness of the time spent on the research or the discovery, the Court shall curtail Plaintiffs' fee requests accordingly.

The second major impediment to Plaintiffs' fee request is that Plaintiffs provide vague references to the type of work that their counsel performed which left the Court guessing as to the purpose of the work and its relationship with the litigation. For example, Plaintiffs frequently make vague references to conferences, office meetings with their counsel, legal research, the review of documents, an opposition to a summary judg-

ment motion which does not exist in the case, and general preparation for discovery and trial. *See, e,g., Phetosomphone v. Allison Reed Group Inc.*, 984 F.2d 4, 7 (1st Cir.1993) (vague references to work performed may be substantially reduced or disallowed). Rather than list each of the hundreds of vague claims which were disallowed or, at the very least, reduced, the Court shall list the amount of permissible legal fees recoverable multiplied by the reasonable hourly rate for each stage in the litigation process. The Court disallowed many of the requested expenses because of the vague references to the actual work performed.

Third, a careful analysis of Plaintiffs' fee request indicated that there were many duplicative, excessive, or otherwise unnecessary expenses. There was an excessive number of hours spent preparing for depositions by both attorneys for Plaintiffs. There was an excessive number of hours spent researching constructive discharge, ADEA, and Law 100 issues which have been repeatedly and thoroughly discussed by the First Circuit Court of Appeals and the Puerto Rico Supreme Court. There were a number of discovery procedures which appeared duplicative and, because there was no explanation of the differences between the variety of references to legal research, preparation for the same deposition, and the review of documents, the Court sharply curtailed the amount of legal fees requested based on these grounds. The absence of contemporaneous time records probably contributed to the use of vague references because counsel for Plaintiffs may not have remembered the exact nature of their prior work.

Finally, Plaintiffs have attempted to recover the fees of both their counsel even in circumstances such as the trial when only one of their attorneys was performing substantially all the work. During the review of Plaintiffs' fee request, the Court has taken this factor into consideration. Very often, the Court has reduced the requested fees, especially for depositions and some of the trial work, where the presence of the second counsel was unnecessary and, at best, duplicative. *See Grendel's Den, Inc.*, 749 F.2d at 953 (reducing fees of co-counsel whose pres-

ence was unnecessary); *Lipsett v. Blanco,* 975 F.2d 934, 938 (1st Cir.1992) ("A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism.").

In light of these considerations, the Court awards Plaintiffs $900.00 (6 hours at a rate of $150.00/hour) for the work of their counsel before the complaint was filed on December 28, 1994. The references to their attorneys' expenses is vague, duplicative, and possibly unrelated to the issues in Plaintiffs' prevailing Law 100 claim.[9] In fact, when Plaintiffs do refer to any specifics, they only mention the ADEA statute. Consequently, all of the listed fees with the exception of the work related to the filing of the complaint has been disallowed.

In addition, keeping the four principal deficiencies in Plaintiffs' fee application in mind, the Court shall grant Plaintiffs the following amounts for attorneys' fees for work performed after December 28, 1994:

1. **$60.00** for ADEA complaint & phone conference with Ramos.

2. **$900.00** for work related to May 3, 1995 status conference.

3. **$60.00** for May 19, 1995 Informative Motion.

4. **$600.00** for work with Dr. Franceschini in June 1995.

5. **$45.00** for phone conferences with Ramos in July 1995.

6. **$450.00** for interrogatory preparation in July 1995.

7. **$90.00** for work with Dr. Franceschini in July 1995.

8. **$90.00** for a short July 27, 1995 status conference.

9. **$150.00** for opposition to motion on affirmative defenses.

10. **$75.00** for interrogatories and production of documents.

11. **$225.00** for discovery and conferences in September 1995.

12. **$225.00** for conferences in October 1995.

13. **$60.00** for review of Dkt. No. 26.

14. **$900.00** for discovery from Nov. 1995—March 1996.

15. **$540.00** for April 1996 discovery including faxes to opposing counsel, interrogatory review, legal research, review of Falcon deposition, and preparing for depositions of Rosaly and Rivera.

16. **$8005.00** for May 1996 discovery including letter to Dr. Franceschini, review of Falcon deposition, preparation for Nieves and Rosaly deposition, meeting with co-counsel, taking Rosaly deposition (excluding attendance by co-counsel), review of documents produced, meeting with co-counsel regarding depositions, preparation for Falcon deposition, review of medical records, preparation for Nieves deposition, attendance at Nieves deposition (excluding attendance by co-counsel as redundant), review of medical records, preparation by co-counsel for Barry deposition and taking of deposition by second counsel, and review of accounting data.

17. **$1730.00** for June 1996 discovery including meetings, preparation for Barry deposition, preparation of data, letter on production of documents, deposition of Barry, analysis of adversary's fax, phone conferences, and revision of documents.[10]

18. **$825.00** for July 1996 discovery including review of letters and review of documents.

---

**9.** For example, for work in October 1994, Plaintiffs request attorney's fees for an opposition to a summary judgment motion, a motion pursuant to federal rule of civil procedure 17(a), and a motion for leave to file translations. None of these expenses were reasonably related to the litigation in federal court because Defendant never filed a motion for summary judgment in the federal case.

**10.** The Court notes that any fees related to Plaintiffs' motion for sanctions were not included in their request for attorneys' fees because the Court already granted Plaintiffs $1,052.92 for all expenses in relation to their motion for sanctions. *See* June 11, 1996 Order, Dkt. No. 32.

19. $2540.00 for August 1996 discovery including preparation of depositions for Barry, Nieves, and Ramos.

20. $1025.00 for September discovery including settlement letter, research, and telephone conference.

21. $7600.00 for settlement, pretrial conference, Zalacaln deposition, and pretrial preparation during the months of October, November, and December 1996, and the month of January 1997.

22. $700.00 for January 28, 1997 Jury Trial. Despite Plaintiffs' claim, the trial lasted a maximum of four hours the first day. Dkt. No. 56. The Court shall not grant Plaintiffs the attorneys' fees for the presence of both counsel. Counsel Brown was trying the case on this day and only his fees are reasonably recoverable.

23. $1750.00 for January 29, 1997 Jury Trial. This includes in-court and out-of-court time for both counsel.

24. $1750.00 for January 30, 1997 Jury Trial. This includes in-court and out-of-court time for both counsel.

25. $1750.00 for January 31, 1997 Jury Trial. This includes in-court and out-of-court time for both counsel.

26. $1750.00 for February 3, 1997 Jury Trial. This includes in-court and out-of-court time for both counsel.

27. $1000.00 for February 4, 1997 Jury Trial. The jury retired for deliberations at 1:30 P.M.

28. $900.00 for post-judgment motions.

The total monetary award for reasonable attorneys' fees for work performed after December 28, 1994 is $36,795.00. Adding the $900.00 for the work done before December 28, 1994, the Court hereby grants Plaintiffs a total of $37,695.00 in reasonable attorneys' fees. The decision to grant $37,695.00 in attorneys' fees was not taken lightly and is based on the Court's familiarity with the litigation and trial work by both counsel for Plaintiffs.

*iii. Pre–Judgment Interest:*

Plaintiffs' final request to amend the judgment to include the pre-judgment interest pursuant to Puerto Rico Rule of Civil Procedure 44.3(b) does not require an extended discussion. The Court does not find that Defendant acted in an obstinate manner during the litigation or the trial of this case. In fact, the jury's verdict in favor of Defendant on Plaintiffs' ADEA claim and two of the co-Plaintiffs' Article 1802 claims demonstrates clearly that Defendant was not obstinate in its defense. Accordingly, the Court hereby denies Plaintiffs' request for pre-judgment interest.

*B. Judgment N.O.V. and New Trial:*

Pursuant to Rule 50(b), Defendant moves for a judgment as a matter of law on the jury's finding of a constructive discharge and the jury's verdict in favor of Rafael Ramos under Law 100. Defendant argues that: (1) Rafael Ramos failed to establish that he was constructively discharged as defined in *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476 (1st Cir.1993), (2) the jury found that age was not a motivating factor in Ramos' constructive discharge, and (3) Ramos did not present sufficient evidence of age discrimination. On these same grounds, pursuant to Rule 59(a), Defendant also moves for a new trial.

The Court's review of Defendant's motion for a judgment notwithstanding of the verdict and motion for a new trial is very limited. A judgment n.o.v. may only be granted if "the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party [is] entitled to judgment." *PH Group Ltd. v. Birch,* 985 F.2d 649, 653 (1st Cir.1993). In evaluating the evidence, however, the Court "may not assess the credibility of witnesses, evaluate the weight of the evidence or resolve conflicts in testimony, but must view all facts and reasonable inferences therefrom in the light most favorable to the non-movant." *Davet v. Maccarone,* 973 F.2d 22, 28 (1st Cir.1992).

Similarly, pursuant to Rule 59(a), " 'a jury's verdict on the facts should only be overturned in the most compelling circumstances.' " *Velazquez v. Figueroa–Gomez,* 996 F.2d 425, 427 (1st Cir.) (quoting authori-

ty omitted), *cert. denied,* 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993). The Court may grant a new trial "only if [it] 'believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.'" *Id.* (quoting authority omitted). "Neither the trial court's disagreement with the jury's verdict nor the fact that the district judge would have found otherwise in a bench trial, is a sufficient basis to displace a jury's verdict." *Davet,* 973 F.2d at 29.

■ In light of these restricted standards of review, the Court must deny Defendant's motion for a judgment notwithstanding the verdict and Defendant's motion for a new trial. Defendant's first argument is that no reasonable person could have found that there was a constructive discharge. Although the Court may not have weighed the evidence, resolved the conflicting testimony, and assessed the credibility of the witnesses in the same manner as the jury, the Court can not state that as a matter of law the jury could have reached only one conclusion, namely, that Defendant was not constructively discharged.

Drawing all reasonable inferences in favor of the jury's verdict, the Court finds that the constructive discharge question was a genuine issue in dispute which was properly left for the jury to decide. Defendant complains that a mere change in cubicle location, change in work title, change in duties, a requirement that the employee work on his vacation time, and an extremely harsh confrontation with a supervisor can not accumulate into a constructive discharge. The Court finds otherwise. Within the confines of the Court's instructions, the jury was free to determine whether the new conditions imposed upon Ramos were so difficult and unpleasant that a reasonable person in his shoes would have felt compelled to resign. Ramos asserted that the new conditions were demeaning and humiliating. The jury could have found that, even though Ramos was being paid the same salary and benefits, Defendant demoted Ramos to an inferior position. Furthermore, the jury could have found that Ramos was treated worse than any other employee in a similar position.

Finally, the jury could have drawn the conclusion that the decision to transfer Ramos to a new position was because of his age.

The Court specifically instructed the jury that they must judge the working conditions from an objective perspective and that an employee like Ramos may not be unreasonably sensitive to his working environment. Once again, although the Court may not have reached the same conclusion, there was sufficient evidence and conflicting testimony for the jury to reasonably conclude that Ramos was constructively discharged. Defendant's reliance upon the existence of a "deliberate" or "intentional" element in a constructive discharge case is inapposite. Even assuming that Defendant is correct, the Court finds that there was sufficient evidence for the jury to determine whether the supervisor of Ramos deliberately imposed arduous working conditions upon Ramos because of his age in an attempt to force him to resign.

Defendant's second argument does not merit much discussion. Defendant argues that the jury's verdict was inconsistent and contradictory. Defendant asserts that the jury found that age was not a motivating factor for Ramos' discharge under ADEA and this is inconsistent with Law 100's presumption of age discrimination once the plaintiff proves that he or she was discharged without just cause.

There are two reasons to reject Defendant's second argument. First, and most importantly, Defendant failed to raise the question of the jury's allegedly inconsistent verdict after the verdict was read and before the jury was dismissed. As a result, Defendant waived its objection to any existing inconsistency. *Toucet v. Maritime Overseas Corp.,* 991 F.2d 5, 8 (1st Cir.1993). Defendant had more than a sufficient amount of time to anticipate any possible inconsistencies between a jury's findings under ADEA and Law 100 before the Court instructed the jury and provided them with the verdict form. Second, even assuming that Defendant did object, the Court finds that the jury's verdict was consistent. As explained previously, the burden of proof under ADEA and Law 100 is entirely different. It is conceivable and appropriate for a jury to find

that an employee failed to meet his burden of proof under ADEA and, simultaneously, the defendant employer failed to meet its burden of proof under Law 100. Defendant's argument essentially boils down to a complaint that the legal framework under ADEA is inconsistent with Law 100. That is not an inconsistency in the jury's verdict but, instead, a significant difference between the burden of proof under federal law and Puerto Rico law. *Wildman v. Lerner,* 771 F.2d 605, 609 (1st Cir.1985); *Dominguez v. Eli Lilly and Company,* 958 F.Supp. 721, 741–43 (D.P.R.1997); *Rosa v. Burns & Roe Services Corp.,* 726 F.Supp. 350, 353 (D.P.R.1989).

▬ Defendant's third argument is that Ramos did not present sufficient evidence of age discrimination. In the context of Law 100, however, the Court finds otherwise. There was not just one isolated, ambiguous comment which laid the foundation for Ramos' age discrimination claim. Indeed, there were three comments, all related to age and all reasonably interpreted with an age-based discriminatory animus, that connected Ramos' constructive discharge with his age. Drawing all reasonable inferences in favor of Ramos, there was the comment by Ramos' supervisor that he was an old man and he should go home early because of his age. There was the comment by Ramos' supervisor that Ramos would have to change positions with a younger employee. And there was a comment, once again made by Ramos' supervisor, that the new supervisor intended to get rid of the older employees and replace them with younger individuals. Furthermore, the jury may have evaluated Ramos' statistical evidence, connected the statistics with the practices of Defendant and Ramos' specific case, and reasonably concluded that Defendant's constructive discharge of Ramos was impermissibly based upon his age. Having met his initial burden of proof under Law 100, the jury was free to evaluate the credibility of the witnesses, consider the contradictions in the evidence, and conclude that Defendant failed to prove that Ramos' constructive discharge was not discriminatory.

Consequently, after considering Defendant's arguments for a judgment n.o.v. and a new trial, the Court finds that the evidence does not lead a reasonable person to only one conclusion, namely, that Defendant is entitled to a judgment under Law 100. Defendant is also not entitled to a new trial because the jury's verdict is not against the clear weight of the evidence and upholding the verdict shall not result in a miscarriage of justice. If Ramos had requested a bench trial, the outcome may not have been the same. Unfortunately for Defendant, however, this is an irrelevant consideration in the context of a Rule 50 and Rule 59 post-judgment motion.

**C. The Bill of Costs:**

▬ Pursuant to Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920 (1997), Plaintiffs as the prevailing parties are entitled to an award of costs. In fact, there is a strong presumption favoring the recovery of costs. *In re San Juan Dupont Plaza Hotel Fire Litigation,* 994 F.2d 956, 962 (1st Cir.1993). Section 1920 lists the six categories of costs which are taxable to the losing party. An award of costs must be carefully tailored to the items in this list. *Rodriguez–Garcia v. Dávila,* 904 F.2d 90, 100 (1st Cir. 1990). These items are:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, costs of special interpretation services under 1828 of this title.

28 U.S.C. § 1920 (1997). The Court has the discretion to deny any of the costs on this list but may not grant the prevailing party fees for expenses that do not appear on the list. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 442, 107 S.Ct. 2494, 2497–98, 96 L.Ed.2d 385 (1987). Plaintiffs are requesting

$25,738.18 in costs but Defendant has opposed the imposition of most of these costs.[11]

Neither Plaintiffs nor Defendant have filed a well-researched motion regarding the items that are taxable as costs. Although Plaintiffs' counsel has sworn under the penalty of perjury that Plaintiffs incurred the listed expenses, Plaintiffs have not filed a single document or exhibit in support of their motion for costs. Furthermore, Plaintiffs have not even attempted to explain, through case law or otherwise, (1) why they believe that the fees for their expert witnesses are taxable, (2) whether they introduced the depositions as evidence or used the depositions at trial and, if not, the special circumstances warranting the taxation of these costs, (3) how the photocopies were necessarily obtained for use in the case, (4) why they believe that Plaintiffs' Exhibit 1 is taxable as part of the costs, (5) why they believe that the cost of the transcript of the first and second day of trial is taxable, and (6) how the faxes, messenger services, postage, printing, stamps, parking, and Westlaw charges were connected with the litigation in this case and, if so, how they are taxable as costs. Defendant's opposition is equally deficient in explaining its objections to most of the listed expenses. Defendant does not cite to any case law but merely voices its opposition to most of the requested fees.

The Court shall begin with section 1920(1) which permits the recovery of the fees of the Clerk and the Marshal. Pursuant to this section, the Court shall grant Plaintiffs the following costs: (1) $120.00 for the filing fee; (2) $31.00 for service of process upon Davis & Geck, Inc.; and (3) $110.00 for the service of the trial subpoenas upon Nivea González and Julio Rivera. The cost of the service of process upon those defendants which were dismissed from the case is not recoverable. *Dopp v. HTP Corp.,* 755 F.Supp. 491, 501 (D.P.R.), *vacated on other grounds,* 947 F.2d 506 (1st Cir.1991). As a result, the Court hereby denies Plaintiffs' request for an additional $144.00 for the service of process upon Cyanamid of P.R., Inc.,

Francisco Rosaly, American Home Products, Inc., and Hazel Barry.

Under section 1920(2), Plaintiffs are entitled to the fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case. "Courts generally consider a transcript necessarily obtained' when it was necessary to counsel's effective performance and proper handling of the case ... or when requested by the court.... The words 'use in the case' signify that the transcript must have a direct relationship to the determination and result of the trial." *Dopp,* 755 F.Supp. at 502. Accordingly, the Court hereby grants Plaintiffs the **$93.75** cost for the transcript of the first and second day of the trial. The Court finds that the transcript was necessary to Plaintiffs' counsel's effective performance and proper handling of the case.

Plaintiffs have also requested court reporter's fees in connection with the depositions of Dr. Maria Teresa Margarida, Hazel Barry, Eli Nieves, and Francisco Rosaly Rosselló. "[I]f depositions are either introduced in evidence or used at trial, their costs should be taxable to the losing party." *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 248 (1st Cir.), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985). If not, the Court may award the costs for the depositions only if special circumstances warrant such an award. *Id.* "While this may appear to result unfairly in the Court's application of twenty-twenty hindsight to the conduct of the parties, and then 'punishing' the prevailing party for discovery which does not prove essential to the result by disallowing its costs, that is the regime under which we operate." *Gochis v. Allstate Ins. Co.,* 162 F.R.D. 248, 251 (D.Mass.1995). Unfortunately for Plaintiffs, they have not indicated whether they introduced into evidence or used at trial the depositions of Dr. Maria Teresa Margarida, Hazel Barry, Eli Nieves, or Francisco Rosaly Rosselló. And if they did not introduce the depositions into evidence or use them at the trial, they have not explained the special circumstances which

---

11. Plaintiff moved to strike the opposition to the request for costs on the grounds that Defendant's motion was untimely. The Court hereby denies Plaintiff's request because the Court granted Defendant an extension of time until April 1, 1997 to oppose the motion. Dkt. No. 83.

warrant the recovery of these costs. Consequently, the Court hereby **denies without prejudice** Plaintiffs' request for the costs of these depositions. Plaintiffs have until **July 3, 1997** to make a second request for these costs and Defendant has until **July 17, 1997** to file an opposition.

Pursuant to section 1920(3), Plaintiffs are entitled to their fees for printing and witnesses. This includes a $40.00 daily attendance fee for their expert witnesses. 28 U.S.C. § 1821(b) (1997). This does not include the expert witness fees for consultation, analysis, and intellectual effort. As the Supreme Court in *Crawford Fitting* expressed, "when a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of § 1821(b), absent contract or explicit statutory authority to the contrary." 482 U.S. at 439, 107 S.Ct. at 2496. Because of that rule, the Supreme Court affirmed the judgments of the Fifth Circuit Court of Appeals which refused to allow a prevailing party to recover expert witness fees beyond the per-day witness fee established in section 1821(b). As the First Circuit indicated before *Crawford Fitting*, "'[a]dditional amounts paid as compensation, or fees, to expert witnesses cannot be allowed or taxed as costs in cases in Federal courts.'" *Templeman*, 770 F.2d at 250 (quoting authority omitted).

Consequently, the Court has no other choice but to deny Plaintiffs' request for the costs of their expert witnesses beyond the $40.00 that should be paid to Dr. José A. Franceschini for his one-day attendance at the trial and the $40.00 that should be paid to Dr. Fernando Zalacaín for his one-day attendance at the trial. In addition, Plaintiffs are entitled to recover **$240.00,** at a rate of $40.00 per day, for the three-day attendance of both Julio Rivera and Nivea González during the trial. Finally, the Court **denies without prejudice** Plaintiffs' request for $179.70 in printing costs which may come within the scope of section 1920(3). Plaintiffs have until **July 3, 1997** to explain whether these costs satisfy the requirements of section 1920(3) and Defendant has until **July 17, 1997** to file an opposition.

Under section 1920(4), Plaintiffs are entitled to the fees for their copies which were necessarily obtained for use in the case. Copies are recoverable when they are reasonably necessary to the maintenance of the action. *Rodríguez–García*, 904 F.2d at 100. Copies of depositions, for example, that were introduced into evidence or used at trial are recoverable expenses. *Templeman*, 770 F.2d at 249. Unfortunately for Plaintiffs, recording what documents were copied and explaining how the documents were used in the case is absolutely necessary before the Court can permit such an award. *In re San Juan Dupont Plaza Hotel Fire Litigation*, 142 F.R.D. 41, 46 (D.P.R.1992); *Goluba v. Brunswick Corp.*, 139 F.R.D. 652, 655 (E.D.Wis.1991); *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth.*, 133 F.R.D. 481, 484 (E.D.La.1990). Because Plaintiffs have failed to document and explain the use of their $2,512.70 expense for copies, the Court hereby **denies without prejudice** this request, grants Plaintiffs until **July 3, 1997** to comply with the documentation rule, and Defendant until **July 17, 1997** to file an opposition.

The Court must also **deny without prejudice** Plaintiffs' additional request of $800.00 for their Exhibit 1. There is a split among the circuit courts of appeals regarding the recuperation of the costs for exhibits. Although the First Circuit has yet to rule on this issue, there are several circuits like the Ninth Circuit which only award the prevailing party for the costs of physically producing the exhibit but not for the intellectual effort involved in its production. *Romero v. City of Pomona*, 883 F.2d 1418, 1428 (9th Cir.1989) (citing supporting cases). In contrast, other circuits such as the Second Circuit permit an award of costs for both the physical production and the expert witness research required to produce the exhibit. *In re Air Crash Disaster*, 687 F.2d 626, 631 (2d Cir.1982). In light of the Supreme Court's decision in *Crawford Fitting*, the Court finds that the better view is to permit the recovery of the costs for only physically producing the exhibits. Once again, because Plaintiffs have failed to break down their costs for the exhibit, the Court hereby **denies without prej-**

udice Plaintiffs' request for $800.00, grants Plaintiffs until **July 3, 1997** to explain this cost, and grants Defendant until **July 17, 1997** to file an opposition.

Plaintiffs' remaining requests include $30.00 for the translation of three exhibits and the costs for many incidental litigation expenses. Pursuant to section 1920(6), the Court hereby grants Plaintiffs their **$30.00** request for the translation of the exhibits but denies all their requests for incidental expenses. Messenger services, faxes, telephone charges, postage, stamps, parking, and Westlaw charges are all out-of-pocket expenses and, therefore, not recoverable. *Riofrio Anda v. Ralston Purina Co.*, 772 F.Supp. 46, 54 (D.P.R.1991), *aff'd on other grounds*, 959 F.2d 1149 (1st Cir.1992) (messenger services and fax transmittals not recoverable); *In re San Juan*, 142 F.R.D. at 46 (postage and electronic research charges not recoverable); *Hollenbeck v. Falstaff Brewing Corp.*, 605 F.Supp. 421 (E.D.Mo.1984), *aff'd*, 780 F.2d 20 (8th Cir.1985) (delivery costs, faxes, and telephone calls not recoverable).

In summary, the following costs are taxable to Defendant pursuant to section 1920:

| 1. | Filing Fee. | $120.00 |
| 2. | Service of process upon Davis & Geck, Inc. | $ 31.00 |
| 3. | Service of trial subpoenas. | $110.00 |
| 4. | Transcript of first and second day. | $ 93.75 |
| 5. | Attendance of expert witnesses. | $ 80.00 |
| 6. | Three-day attendance of two witnesses. | $240.00 |
| 7. | Translation of 3 letters. | $ 30.00 |
| | **Total Expenses:** | **$704.75** |

As a result, the Court hereby **grants in part** Plaintiffs' motion for costs in the amount of **$704.75.**

*D. Execution of Judgment and Supersedeas Bond:*

Plaintiffs' motion for the execution of the judgment has been rendered moot by the posting of a $400,000.00 supersedeas bond. Pursuant to Federal Rule of Civil Procedure 62(d), the Court hereby **approves** of the supersedeas bond and the execution of the judgment shall be stayed pending Defendant's appeal to the First Circuit Court of Appeals.

*Conclusion:*

1. The Court hereby **denies** Plaintiffs' request for front pay under Law 100;

2. The Court hereby **grants in part** Plaintiffs' request for attorney's fees under Law 100 in the amount of **$37,695.00;**

3. The Court hereby **denies** Plaintiffs' request for prejudgment interest pursuant to Puerto Rico Rule of Civil Procedure 44.3(b);

4. The Court hereby **denies** Defendant's request for a judgment n.o.v.;

5. The Court hereby **denies** Defendant's request for a new trial;

6. The Court hereby **grants in part** Plaintiffs' request for costs in the amount of **$704.75.** Plaintiffs are hereby **granted until July 3, 1997** to revise their motion for the costs of the depositions, the printing, the copies, and Exhibit 1. Defendant is hereby **granted until July 17, 1997** to oppose the motion;

7. The Court hereby finds that Plaintiffs' motion for the execution of judgment is **moot** and, simultaneously, **approves** of Defendant's $400,000.00 supersedeas bond.

**IT IS SO ORDERED.**